Per Curiam:
A cost-plns-fixed-fee contractor sues the United States for reimbursement of expenses and costs incident to three companion suits brought in the New Jersey-state courts against the contractor by some of its employees.[1] These suits charged the contractor (and certain of its officials and employees) with conspiracy with a union and union officials to deprive the suing employees of seniority rights and employment to which they were entitled. After a jury trial in the Superior Court of New Jersey,[2] a verdict was rendered against the contractor and substantial judgments were entered. The Appellate Division of the Superior Court affirmed the judgments in an opinion which declared that “there was ample proof to warrant a finding by the jury that the employer [i.e., the contractor] and the union acted in concert in wilfully and maliciously interfering with plaintiffs’ right to employment under the collective bargaining agreement.” The Supreme Court of New Jersey affirmed without opinion.
Dade Brothers’ contract with the Government provided that, if the Contracting Officer determined that the contractor should defend “litigation in connection with claims of third parties arising out of the performance of the contract,” the contractor would be entitled to reimbursement of “the cost and expense of such litigation, including judgments and court costs, allowances rendered or awarded in connection with suits for wages, overtime or salaries, and reasonable attorney’s fees for private counsel ** * Belying on this provision, the contractor applied for reimbursement of the *488 amounts of the judgments paid the employees and the litigation expenses and costs incurred in the New Jersey suits. The Contracting Officer disallowed any reimbursement because the contractor had violated its obligations under its contract with the United States by engaging in the conspiracy found by the state courts; therefore, he held, the New Jersey litigation did not arise out of the proper performance by the contractor of its contract with the Government (within the meaning of the litigation-reimbursement clause). This adverse determination was affirmed by the Claims and Appeals Board of the Corps of Engineers and by the Armed Services Board of Contract Appeals. The present action was then begun.
At an earlier stage of this case, the parties entered into a stipulation of facts and on the basis of that stipulation presented to the court the issue of the defendant’s liability. After briefing and oral argument, the court ordered the case referred to a trial commissioner “for further proceedings limited to the question whether or not the decision of the Armed Services Board of Contract Appeals was arbitrary, capricious or unsupported by substantial evidence.” The trial commissioner has made his findings of fact on the basis of the parties’ stipulation and exhibits, including the record before the appeal boards within the Department of Defense; no oral testimony was offered in this court. The commissioner has concluded that “the entire record of the case does not establish that the decision of the Armed Services Board of Contract Appeals was arbitrary, capricious, or unsupported by substantial evidence.” New briefs have been presented, and the case has again been argued orally.
We agree with the trial commissioner’s subsidiary findings and also with his conclusory finding that the determination of the Board of Contract Appeals was adequately supported. The Board had before it the results of and proceedings in the New Jersey litigation. It also had before it the oral testimony of the contractor’s officer (before the Engineers Claims and Appeal Board) denying the conspiracy and wrongdoing found by the New Jersey courts. Certainly, the Board of Contract Appeals was entitled to accord great weight, as it did, to the judgments of the New *489 Jersey courts; but we do not read the Board as holding itself bound by those state court judgments — either on the basis of collateral estoppel or any other doctrine. Bather, the Board decided, on the basis of everything before it including the judgments, that the contractor had failed to show (a) that the New Jersey judgments were erroneous, (b) that it had not breached the union agreement and the government contract, or (c) that the acts resulting in the New Jersey litigation were committed by the contractor in the faithful performance of the government contract. We hold that the Board was free to reach these conclusions and was not required, on the record before it, to decide in the contractor’s favor.
Once the Board’s determinations are accepted, and we do accept them, there is no ground for recovery against the Government. Neither the wording nor the policy of the litigation-reimbursement article of the government contract authorizes reimbursement of expenses incurred because the contractor breached its agreement with the Government or failed to perform that contract faithfully. Nor can we accept plaintiffs’ argument that the clause automatically becomes applicable whenever the Contracting Officer asks the contractor to defend litigation brought by third parties. In litigation like that instituted against the contractor here, the Government cannot tell whether its contract has been breached until the conclusion of the case; it is not required to make that determination at the outset before the merits of the matter are known. In this case, the Contracting Officer made it clear to the contractor, from the beginning, that the issue of reimbursement would be decided subsequently and that reimbursement would not be a matter of course. See findings 13-16,18-19,21. Finally, plaintiffs charge that the defendant’s representatives approved and participated in the conspiracy between Dade Brothers, Inc. and the union. But the Engineers Claims and Appeals Board specifically found that there was no evidence that the Contracting Officer was aware of or had reason to be aware of the existence of the conspiracy found by the New Jersey courts; there is no indication that this finding was rejected or disapproved by the Board of Contract Appeals and we see no *490 reason why it should have been. In any event, wrongful participation by government officials in a tortious conspiracy such as was found here would put them far outside their authority to represent the United States with respect to this contract. Under established principles, the United States would not be liable under the contract for such wrongful acts of officials exceeding their authority.
The petition is dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the stipulation and exhibits, the report of Trial Commissioner Bichard Arens, and the briefs and arguments of counsel, makes findings of fact as follows:
1. (a) Plaintiff, Dade Brothers, Inc. (hereinafter sometimes referred to as “Dade”), is and was at all pertinent times a corporation organized and existing under the laws of the State of New York, with its principal office in New York City.
(b) Plaintiff, Chesapeake Industries, Inc., is and was at all pertinent times a corporation duly organized and existing under the laws of the State of Ohio, with its principal office in New York City. Since May 15, 1952, it has owned all of the outstanding capital stock of plaintiff, Dade Brothers, Inc. About September 29, 1955, plaintiff Chesapeake Industries, Inc., paid $30,000 as guarantor of a supersedeas bond executed by plaintiff Dade Brothers, Inc., and received from the latter an assignment of all of its rights against the defendant as asserted in the present action. In August 1959 plaintiff Chesapeake Industries, Inc., became known as the America Corporation.
2. Under date of May 11, 1952, Dade executed a cost-plus-fixed-fee contract (hereinafter referred to as “the contract”) with defendant, acting through the Atlantic District Engineers, Corps of Engineers, Department of the Army. The contract provided for the performance by plaintiffs of terminal or processing services, including the packaging of machinery, airplane parts, bulldozers, heavy and light hardware, and allied items for transportation to bases in Morocco, North Africa, and Greenland. The contract provided for *491 a fixed fee of $288,000 and an estimated operating and service cost, exclusive of fixed fee, of $16,290.
3. The contract provided in pertinent parts as follows:
ARTICLE I. STATEMENT 0E WORK.
1. The Contractor shall, during the calendar year 1952, furnish all labor, material, equipment, supplies and ac-cessorial services not furnished by the Government, and do all matters and things necessary to receive, unload, reload, identify, dismantle, mark, warehouse, store, guard, preserve, pack, stencil, process for export shipment, and deliver to dock alongside steamer or aboard scow or lighter with transportation thereof to piers in the New York metropolitan area, all construction equipment, materials and supplies, which the Government or its contractors may tender, f.o.b. land or water carrier, to the Contractor at Claremont Terminal, Jersey City, N.J., for shipment to overseas projects under the jurisdiction of the Corps of Engineers, Department of the Army. * * *
H: H; H; $ H<
ARTICLE IV. COST OE THE WORK.
1. Reimbursement for Contractor's Expenditures'. * * *
❖ * ❖ ❖ *
t. In the event the Contracting Officer shall determine that the best interests of the Government require that the Contractor initiate or defend litigation in connection with claims of third parties arising out of the performance of this contract, the Contractor will proceed with such litigation in good faith and the cost and expense of such litigation, including judgments and court costs, allowances rendered or awarded in connection with suits for wages, overtime or salaries, and reasonable attorney’s fees for private counsel when the Government does not furnish Government counsel, shall be reimbursable under this contract.
* * * ¡H *
ARTICLE VH. SPECIAL REIMBURSEMENTS.
* *
e. The Contracting Officer may require the Contractor to dismiss from work such employee or employees as the Contracting Officer deems incompetent, careless, or insubordinate or whose continued employment is deemed inimical by the Contracting Officer to the public interest. * * *
*492 4. As provided for therein, the contract was terminated for the convenience of defendant by notice dated September 24, 1952, effective October 31, 1952. Pursuant to a termination agreement between the contracting parties dated December 10, 1954, defendant paid Dade a fixed fee of $256,673. The termination agreement was by its terms specifically limited to a determination of the proportion of the fixed fee which was to be payable to Dade by defendant. The agreement further specifically provided that Dade would continue to be entitled to reimbursement of such costs as were allowable or payable under the applicable provisions of the terminated contract.
5. In the performance of the contract during the period before its termination, and incident thereto, Dade necessarily employed various crafts of laborers, including ware-housemen, longshoremen, packers, checkers, and teamsters. The provisions of the contract required Dade in the performance thereof to abide by all the terms and conditions of a union agreement with the Marine Warehousemen’s Local affiliated with the International Longshoremen’s Association covering warehouse employees.
6. The agreement entered into between Dade and Marine Warehousemen’s Local Wo. 1478 on December 1,1951, which was in effect during the performance of the contract, contained among other provisions the following:
* * * Employees shaping regularly for each company shall be entitled to employment in work for which they have the necessary qualifications in order of their seniority with the company. Employees voluntarily leaving or discharged from the company’s employ shall forfeit all claims to seniority previously established. Employees failing to shape for a period of two months shall be deemed to have voluntarily left the employ of the company. In computing total length of service, leaves of absence authorized by the company and temporary transfers to positions not covered hereby, shall be considered as time served.
% % :¡s * #
Each employee shall be entitled to one week’s vacation with pay if he has worked at least 700 hours and two weeks’ vacation with pay if he has worked at least 1200 hours, during the year ending September 30th. One week’s vacation pay shall be for forty hours and two *493 weeks’ for eighty hours at the straight time rate. Employees eligible for vacations but laid off or no longer in the employ of the Company shall receive vacation pay in lieu thereof.
^ ^ ^
Any employee who has worked a total of twenty-four (24) straight thAe hours during his regular or normal work week in which any of the following holidays falls, shall be paid for eight (8) hours straight time in addition to pay for any time actually worked on such holiday : New Year’s Day, Lincoln’s Birthday, Washington’s Birthday, Decoration Day, Fourth of July, Labor Day, Columbus Day, Election Day, Armistice Day, Thanksgiving Day and Christmas Day.
7. On or about October 21, 1952, November 1, 1952, and December 5,1952, three suits were filed in the lower courts of New Jersey against Dade, the same being identified and entitled Todd, et al. v. Dade Bros., Inc., et al. (Docket No. 63243, Hudson County Ct., Law Division); Bryant, et. al. v. Dade Bros., Inc., et al. (Docket No. L-1690-52, N.J. Super. Ct., Hudson County); and O'Brien, et al. v. Dade Bros., Inc., et al. (Docket No. L-2588-52, N.J. Super. Ct., Hudson County). The suits were instituted respectively by 21, 29, and 4 employees of Dade who were members of the Marine Warehousemen’s Local. The suits named as defendants, in addition to Dade, Local No. 1478, Vincent Brown and Anthony Piscopo (officers of Local No. 1478), Augustine De-Acutis (hiring boss for Dade and also an officer of Local No. 1478), James Cissel (vice president and project manager of Dade), and Hugh McGill (labor relations manager of Dade). The complainants sought recovery of certain alleged holiday, vacation, and Sunday pay or pay differentials. Primarily, however, the complainants alleged that the employees and members of the union had been denied seniority rights and employment to which they were entitled beginning on August 14,1952, to and including the date of suit, and that such denial was “by reason of the malicious and unwarranted action” of or by reason of conspiracy among the defendants in the suit. In addition to damages consisting of alleged loss of wages, each of the complainants sought $5,000 “compensatory and punitive damages.”
*494 8. In answer to the three complaints, Dade admitted that the employees were entitled to the “fringe benefits” such as wage increases, vacation pay, holiday pay, overtime and insurance, as alleged in the suits, and so did not oppose entry of partial summary judgment therefor. On January 13 and January 23,1953, judgment was accordingly entered in favor of the employees for said fringe benefits in the sum of $14,912.50. The judgment was thereafter paid by Dade. Defendant subsequently approved reimbursement to Dade for the amount of the judgment and other disbursements and for the major portion of the attorney fees incurred in that phase of the litigation.
In answer to the remaining allegations of the complainants involving deprivation of seniority and employment, Dade and its officials denied that they had refused to hire the employees subsequent to August 14,1952, as asserted in the complaints, or that they had acted in any way in concert with the officials of Local No. 1478 for the purpose of depriving the employees of their seniority rights or benefits. They contended, rather, that the employees had participated in work stoppages in violation of the union agreement of December 1, 1951, and that Local No. 1478 had, without Dade’s advance knowledge or ability to control, imposed upon the employees such discipline as loss of seniority rights. They contended that the dispute was entirely an internal union matter.
9. The three suits were consolidated in the Superior Court for jury trial, which commenced on November 23, 1953, and concluded on December 10,1953, at which time the trial court entered judgment on the verdict of the jury as follows: In favor of 43 employees against Dade and Local No. 1478 in the total amount of $25,841.60 compensatory damages and $8,600 punitive damages, or a total of $34,441.60; and in favor of all individual defendants and against the employees. As a result of said verdict, the employees were held entitled to compensation during the period that they were deprived of their rights to work under the union agreement subsequent to August 14, 1952. On July 9, 1954, the judgments in the three cases were amended, on the mandate of the Appellate Division of the Superior Court dated June 21, 1954, to re- *495 fleet that no verdict was returned either for or against the individual defendants.
10. Dade prosecuted an appeal to the Appellate Division of the Superior Court of New Jersey from the judgments entered by the trial court in the three suits. On November 4, 1954, the Appellate Division affirmed the judgments as amended. The opinion of the court reads in part as follows:
The record discloses that plaintiffs were warehouse-men in the employ of Dade Bros., Inc. at the Claremont Terminal, a waterfront pier in Jersey City. They were members of the defendant labor union, which had a collective bargaining contract with the employer. Under that contract the employees had certain seniority rights.
Apparently the men employed on a day to day basis. They would assemble or “shape up” on the pier each morning and an employee of Dade Bros., known as the hiring boss, would make individual selections among the men until the required number for the day was reached. The hiring boss was the defendant, Augustine De Acu-tis, also a member of the union and for part of the period involved president thereof. Originally he was engaged as a stevedore and later he became hiring boss, a position he held for about eighteen months until the Terminal closed on October 31,1952.
De Acutis was active in the union, which apparently was in the throes of internal dissension arising out of his conduct as hiring boss. The plaintiffs claimed that their seniority rights to employment under the contract were being ignored at the morning shape-ups by De Acutis with the consent and cooperation of the employer. Dade sought to take the position at the trial that De Acutis was designated hiring boss by the union and that it had no control over his activities. However, without detailing the evidence, a clear factual issue on this subject was presented for determination by the jury.
In any event on June 24, 1952, because of alleged indiscriminate hiring without regard to length of service and for other grievances connected with contract benefits, the aggrieved warehousemen struck. The strike lasted one day, when according to the plaintiffs an oral agreement was reached to remedy the conditions and they returned to work.
However, the next day at the shape-up the agreement was ignored and on June 26th, 158 warehousemen struck and. engaged in picketing until July 7th. During this period plaintiffs asserted that the employer agreed with *496 their committee to prepare and post a seniority list to be followed. Proof was introduced to demonstrate that this and other promises made were not fulfilled and that there continued to be a disregard of seniority. The result was that the men walked out again on July 24th and resumed picketing.
Evidence was introduced to show that during the early part of this picketing, the employer through its representatives, and particularly the vice president in actual charge of the pier operation, stimulated and activated a situation between the non-strikers and the picketers which led to a serious commotion and near riot and which might have ended in a large scale physical affray if it were not for the substantial efforts of the local police. * * *
* * * * *
Thereafter, on August 5th, a conference was held between the committee of the strikers and representatives of the union, with representatives of the employer in attendance. At this meeting one Connolly, a vice president of the International Longshoremen’s Association, said to the committee: “You’se fellows is out. Those loyal men are going to work and you is out.” This broke up the meeting and the strikers resumed picketing.
In addition to the picketing, the strikers instituted an injunction suit in the Chancery Division of this court against the International, the Local union and certain of their officers, including Connolly and De Acutis.
Public officials of Jersey City having interested themselves in the affair, further conferences were held at the City Hall at which company, union and insurgents were present. Finally on August 13th an agreement was reached and a written but unsigned memorandum made of the terms thereof.
Under this memorandum among other things “the entire dispute” was to be submitted to independent arbitration. The specific nature of the dispute was not described but plaintiff contended that it related to the seniority question. In listing the matter agreed upon, paragraph 4, said, “Betum of the men to work immediately, with insurgent members to be absorbed as soon as possible.”
At the trial, the Dade Bros, contended that the concord signified by this paragraph was that pending the arbitration all of the “loyal” men who had not gone on strike would be employed first, regardless of seniority, and that when they were taken care of the strikers would be hired as the need arose. And it further claimed that *497 the strikers agreed to waive seniority until the arbitration ended.
The strikers claimed that the agreement was, and that paragraph 4 was intended to indicate, that all men were to return to work immediately, with the insurgents absorbed in the day to day lairing on the basis of seniority. And they claimed with much force that they would not have agreed to withdraw their picket line and give up or waive, pending the arbitration, the very thing which they had been struggling to enforce, i.e., their seniority rights.
_ As to this the trial court held, and we concur in his view, that the language of the paragraph was ambiguous and that the jury should decide on the basis of the proof what the agreement between the parties was in fact.
Plaintiffs’ proof shows that Dade Bros, did not hire through De Acutis, the hiring boss, according to seniority between August 15 and September 22nd, the date of the rendition of the arbitrator’s decision. In fact, Dade’s brief on this appeal says that it “concedes that plaintiffs would have been entitled to employment during the period August 15th to September 22, 1952, by virtue of seniority, if there had not been a waiver of sucia seniority.” Of course, the verdict of the jury must be taken as a fhading that no such waiver was made.
The arbitration hearings were held on September 3rd and 9th, 1952, at which, according to the arbitrator, the sole issue submitted was whether the action of the union in 'depriving the strikers of their seniority for what the ■union called an unauthorized strike was proper. The written decision of the arbitrator rendered on September 22nd was to the effect that the action was improper and that the deprivation of seniority could not be sustained.
Plaintiffs offered proof teiading to show that, despite this decision, the hiring boss and the company,_ with few exceptions, coaatinued to ignore their seniority rights thereafter and down to October 15, 1952, the last date for which the plaintiffs claim compensation.
Dade argued that plaintiffs engaged in wildcat strikes without authorization of the union and in violation of the management-union collective bargaining agreement which established machinery including arbitration for the handling of disputes. However, the jury must have regarded it as significant that Dade never undertook to discharge the plaintiffs, which manifestly would have been its right if there was no basis for the charges of *498 unfair labor practices with regard to seniority and if the strikers were illegal.
In any event, testimony was offered indicating that neither the union nor the employer’s representatives would listen to the grievance complaints of these men, despite the fact that the vice president in charge of the operation conceded he had complaints that De Acutis “took extreme and brutal discriminatory disciplinary action.” One witness said that both the company and the union laughed and sneered at their grievances. And there was evidence that the men were shunted back and forth between the union and the employer’s officials, accomplishing nothing with respect to vindication of their claims. Another plaintiff said that one of two Dade representatives was always present at the shape-up. When De Acutis ignored his seniority in hiring the men for the day and he complained to these company men, he got nowhere. It appeared, however, that when the company’s warehouse superintendent wanted a man put on, he said to De Acutis: “I am putting this man on today,” and it was done.
There was much dispute in the testimony, the employer’s position being that it was the innocent victim of dissension within the union. However, there was ample proof to warrant a finding by the jury that the employer and the union acted in concert in wilfully and maliciously interfering with plaintiffs’ right to employment under the collective bargaining agreement. Kuzma v. Millinery Works, etc. Local 24, 27 N.J. Super. 579 (App. Div. 1953). Our appraisal of all of the proof made in the light of the basic rule that due consideration must be given to the opportunity of the trial court to see and hear witnesses, has led us to the conclusion that the action of the jury was not contrary to the weight of the evidence.
# ❖ * # *
It must be assumed from the charge of the court and the fact of the verdict against the employer that the jury found the employees as representatives of their employer, guilty of the tortious conduct complained of. The fact that the personal liability of the employees was not declared by way of individual judgments against them, for some unexplained reason, should not and does not vitiate the declaration of the employer’s responsibility.
11. Dade thereupon filed a timely petition for certification before the Supreme Court of New Jersey, which, on May 23, 1955, affirmed the judgments below without opinion.
*499 12. When the three suits were filed against Dade (finding 7, supra), Dade submitted timely requests under the terms of the contract for representation by the United States attorney for the District of New Jersey.
13. The United States attorney for the District of New Jersey, as instructed, entered formal appearances on behalf of Dade soon after the commencement of the Todd and Bryant suits, but the United States attorney’s appearances on behalf of Dade were subsequently withdrawn. The body of a letter dated December 20, 1952, addressed to Dade from the Contracting Officer, reads as follows:
This office was informally advised on 18 December 1952 by the East Ocean Division, Corps of Engineers, and Mr. John Barry, Assistant United States Attorney that instructions have been received from the Attorney General’s Office, Washington, D.C., directing the United States Attorney for the District of New Jersey to withdraw from the defense of the subject lawsuits and to arrange to have private counsel substituted.
In the absence of the officers of your organization whom we were advised were out of town, the foregoing information was orally transmitted to Mr. Esposito of your office immediately upon receipt thereof.
In view of the foregoing, it shall be necessary for you to retain private counsel to defend the litigation. It is imperative that immediate action be taken in this matter since there is now pending before the Court a motion for partial summary judgement which has been adjourned due to the substitution of counsel from 19 December 1952 to 9 January 1953.
The question of reimbursability of the cost and expenses of such litigation including judgements and court costs together with reasonable attorney’s fees for private counsel shall be determined by the Contracting Officer at a later date.
Dade thereafter advised defendant that John E. Keale had been retained to undertake the defense of the litigation.
14. On December 30, 1952, the Contracting Officer wrote Dade concerning the O'Brien suit as follows:
This letter is to confirm numerous conversations had between Mr. Condon and Mr. Hodes of this office with Messrs. Clark, Cissel and Esposito of your office, commencing December 18,1952, in which you were informed that the U.S. Attorney would not be able to represent you *500 in the defense of the above action and of the necessity of your immediately retaining your own attorney for that purpose.
It is reiterated that it is imperative that immediate action be taken by you in this matter, if same has not already been done.
The question of reimbursability of the cost and expenses of the subject litigation, including judgments and court costs together with reasonable attorney’s fees for private counsel shall be determined by the Contracting Officer at a later date.
15. By letter dated January 20, 1953, Dade’s executive vice president advised the Contracting Officer that Dade had retained its own counsel in the two prior cases and requested advice as to whether or not it should retain counsel in the action instituted by O'Brien, et al. The letter further stated that in the event the Government did not furnish counsel, Dade would continue to retain private counsel and would look to the Government for reimbursement under the provisions of the contract. In response, the Contracting Officer, by letter dated January 21, 1953, advised that Dade had received instructions with reference to the retention of private counsel in the letter of December 30, 1952 (finding 14, supra).
IS. Under dates of September 4 and September 21, 1953, Dade addressed two letters to the Contracting Officer in which Dade insisted upon a ruling as to the reimbursability of the litigation expenses in connection with the three lawsuits. A responding letter from defendant dated November 18, 1953, reads in pertinent part as follows:
This office authorized payment on a reimbursable basis for those portions of these suits which sought “fringe benefit” payments under the retroactively approved collective bargaining agreement you made with the Union concerned. Since, through no fault of yours, the US. Attorney withdrew as defense counsel and you retained private counsel to conclude that phase of the matter, there can be no doubt that all proper litigation expenses applicable to those counts, including a proper proportion of a reasonable attorney fee covering the entire case, will ultimately be approved for reimbursement. However, the term “reimbursement”, particularly as used in your CPFF contract, does not envisage solici *501 tation of the Government until you have yourself concluded a payment of the basic obligation.
Moreover, as to litigating attorneys’ fees, for obvious reasons it has always been the policy of the Corps of Engineers, in administering CPFF contracts, to consider reimbursement questions only after the suit is concluded.
As to the remaining counts in this litigation, which primarily involve charges that you conspired to deprive these plaintiff-employees of certain of their contract rights, it seems clear that the merits of the matter will not be known to the Government with certainty until after the court (s) has concluded action on the cases. As to that phase of the matter, all litigation expenses and fees will have the same status as the potential judgment. Since your reimbursement rights under the CPFF contract (DA-30-317-ENG-4) cannot therefore be determined as yet on said phase of the matter, the Contracting Officer was correct in refusing to make a premature ruling for you.
The Office of the Judge Advocate General, as legal advisor to the Secretary of the Army, has been formally consulted in these regards, and concurs in the above views.
17. The body of a letter dated December 15, 1953, addressed to defendant’s Contracting Officer from the vice president of Dade, reads as follows:
This will confirm the telephone conversation held with your office this date regarding the referenced law suit.
We are enclosing a copy of a letter received from our attorney this date in which he recommends that an application for a new trial should be made, and in the event that such application should be unsuccessful, an appeal should be taken.
The Contractor concurs with the recommendation of its attorney and asks that authorization be granted by the District Engineer to continue this matter along the lines suggested by the legal counsel.
It should be noted thatapplication for a new trial must be made within ten days after the verdict of the jury. The verdict was handed down December 10; therefore authorization from your office should be received on or before December 18.
So as to forestall any executions on the part of the plaintiff’s attorney against our New Jersey bank accounts, we are proceeding immediately to post a bond equal to the amount of the judgment ($35,000) pending your approval of the above-outlined course of action.
*502 In the event that you require further or more detailed information, please advise.
18. The body of a letter dated December 22, 1953, addressed to Dade from the authorized representative of the Contracting Officer, reads as follows:
Reference is made to your letter to this office, same subject as above, dated 15 December 1953, and to letter from your attorney to you, dated 14 December 1953, attached thereto. This letter confirms telephone conversation had between Mr. Hodes, Assistant Chief, Legal Branch, this office, and Mr. Van Ness, your office, on 18 December 1953, in connection with subject matter contained in aforesaid letter of 15 December 1953.
You are hereby advised that this office cannot, at this time, grant authority to you to take the action as proposed and indicated in your said letter of 15 December 1953 and in the aforesaid letter from your attorney, dated 14 December 1953.
This office will give consideration to the question of reimbursability of any payments on the judgment in the subject litigation which you may be compelled to make and of any other expenses incurred in connection with said litigation and any future legal proceedings which may ensue with respect thereto, after the subject litigation has been conclusively determined. It is suggested that with respect to the proposed application for a new trial and appeal from the judgment, you should be guided in your decisions by sound business and legal judgment.
This letter should not be construed as a direction to you to refrain from taking any of the proposed legal steps referred to above.
19. Under date of February 23, 1954, plaintiffs’ attorney wrote the Chief of the Legal Branch of the Atlantic District Engineer and advised that its attorney, Thomas J. Brogan, had initiated preparation of an appeal from the judgment of the Superior Court and requested reimbursement of printing expenses which were being incurred. Under date of March 15, 1954, the Chief of the Legal Branch informed plaintiffs’ counsel that the question of reimbursement for costs incurred in connection with the referenced litigation “cannot be considered until after litigation had been conclusively determined.”
*503 Dade did not seek “authorization” or “approval” from the Contracting Officer for its subsequent petition for certification before the Supreme Court of New Jersey.
20. By letter dated May 25', 1955, plaintiffs’ counsel wrote to the defendant as follows:
I have been informed today that Dade Brothers, Inc. has lost its appeal to the State Supreme Court, the highest court of the State of New Jersey, and that the court has affirmed an award of $34,442 to certain workers and former employees of Dade Brothers, Inc. I have not as yet received a copy of the decision, but will forward you one just as soon as I do.
In the past, when I have made formal and informal requests for reimbursement to Dade Brothers, Inc., for costs incurred in connection with the above referenced litigation, the Chief of the Legal Branch of the Atlantic District and the Judge Advocate General have informed me that the question of such reimbursement could not be considered until after litigation had been conclusively determined. The litigation has now been conclusively determined.
Vouchers have already been submitted to you periodically in the amount of $22,582.25, representing legal, printing and bonding fees incurred in connection with the suit. In addition thereto, Dade Brothers, Inc., has received an additional bill from its counsel, Judge Brogan, in the amount of $10,979.94, of which Dade Brothers, Inc., has paid $2,500, making in all total payments by Dade Brothers of $25,082.25.
I am herewith enclosing for your information and convenience a breakdown of the legal, printing and bonding fees incurred to date on this matter, totalling $33,562.19, which together with the judgment of $34,442 represents a total approximate expense of $68,004.19. In addition to this amount, further vouchers will be submitted for time actually spent in assisting in the preparation of this case, testifying, etc. on behalf of Messrs. James Cissel, George C. Dade, E. T. Clark and certain other attorneys and accountants. I would estimate that the total claim will be approximately $80,000 to $85,000.
Although the aforementioned judgment with the exact amount will be forwarded to you later together with certain other vouchers as mentioned above, please consider this as a formal claim for reimbursement of any and all costs incurred in connection with the above refer *504 enced litigation and particularly covered by Article IV (t) of Contract No. DA-30-347-ENG. 4.
Since I am anxious to complete this matter as promptly as possible, would you please render me your decision as to reimbursement within the next seven days. The only decision which I am interested in at this time is whether or not you will generally and as a matter of principle reimburse the costs incurred in connection with the litigation. I am not, at this time, interested in individual items or amounts which you may or may not approve and which may be subject to negotiation.
I am enclosing two extra copies of this letter so that you may forward them to the Judge Advocate General’s office, where I understand the decision is to be made.
21. Dade supplemented the letter of May 25, 1955, with a letter dated June 6, 1955, again requesting a decision as to reimbursement in connection with the cost incurred with reference to the litigation. Under date of June 7, 1955, defendant replied in part as follows:
Your request for reimbursement is being given appropriate consideration. However, no final determination can be made until you have furnished this office with a full and complete itemized statement of the total costs in connection with subject litigation.
Your prompt compliance with this request will expedite a decision concerning the subject of reimbursement.
22. Subsequent to June 6, 1955, the Contracting Officer received several additional letters from plaintiffs’ counsel requesting a decision, and the Contracting Officer made several requests for cost breakdowns so that a proper determination could be made. On September 8, 1955, plaintiffs’ attorney wrote to the Contracting Officer demanding payment to Dade of $73,160.39, and stating:
The only other invoice which will be submitted to you will be my bill for legal services incurred, unless the matter should be prolonged or subsequently litigated. In that event, of course, it will be necessary for Dade Brothers to incur certain accounting expenses and additional legal expenses. At such time as this matter is finally resolved my final bill for legal services will be submitted to you. (We have determined that no bill for accounting services rendered by Mr. Esposito will be submitted to you unless the matter goes further.)
*505 Plaintiffs’ counsel also requested that if the Contracting Officer’s decision was unfavorable it be reduced to writing under Article X, the Disputes clause, and forwarded to him. The Contracting Officer requested that plaintiffs’ counsel furnish his “charge for legal services to date,” and thereafter received from plaintiffs’ counsel a copy of an unitemized bill for $2,500 for services from May to September 23,1955.
23. By letter dated October 27,1955$ the Contracting Officer rendered a decision under the Disputes clause of the contract, which letter reads in part as follows i
By letter, dated 25 May 1955, the Contractor advised this office that the Supreme Court of the State of Xew Jersey had affirmed adverse lower court decisions in subject litigation and requested reimbursement of the judgment, interest, court costs, legal fees and related expenses pursuant to Article IV, paragraph 1, subparagraph (t) of the contract. To date, the Contractor’s total claim for reimbursement is the sum of $75,660.39.
It is the determination of the Contracting Officer that in the performance of subject contract, the Contractor has failed to faithfully comply with the terms of the contract as indicated in the attached Findings of Fact in support of this determination. Accordingly, the request by the Contractor for reimbursement of the total amount of $75,660.39 is disapproved, except that the Contractor will be reimbursed for the sum of $522.65 which represents reasonable counsel fees and disbursements payable to John E. Keale, Esq., in connection with the fringe benefit phase of subject litigation.
You are advised that the foregoing constitutes the final decision of the Contracting Officer. Your attention is invited to Article X of the Contract entitled “disputes”, whereby you may appeal this decision to the Chief of Engineers within thirty (30) days after receipt of this decision. If appeal is taken, same should be processed through this office to facilitate action thereon.
The Contracting Officer’s findings of fact which accompanied the letter of October 27,1955, read in part as follows:
13. The Contractor has requested reimbursement in connection with subject litigation under Article IV (t) of the prime contract for the following:
a. Judgment, interest and costs — $38,245.81.
b. All legal fees and other expenses related to the litigation in the total amount of $37,414.58 as indi-
*506 14. It is the determination of the Contracting Officer that Dade Brothers, Inc. is not entitled to be reimbursed as requested under Article IV, paragraph 1, subpara-graph (t) of the basic contract, for the judgment and litigation expenses set forth in the preceding paragraph for the following reasons:
a. In addition to compensatory damages, punitive damages in the amount of $200.00 for each of the forty-three plaintiffs were assessed against Dade Brothers and Marine Warehousemen’s Local No. 1478. The assessment of punitive damages establishes that Dade Brothers maliciously and wilfully perpetrated a wrong upon each of the plaintiffs in subject litigation by its refusal to recognize the seniority rights as established by the union agreement. Generally, a verdict for punitive damages is justified when it is determined that the defendant maliciously and wantonly agreed to perpetrate and to commit a tort and did so.
b. The Contractor flauntingly violated Article I, paragraph 4 of the contract which provides that “The Contractor, upon the responsibility of its corporate officers, shall (1) faithfully and diligently administer performance of this contract; (2) carefully recruit, furnish, supervise and maintain an adequate force of competent and dependable employees; * * * (5) do and perform all other administrative and managerial services^ reasonably .required to perform, with diligence and dispatch, all obligations of this contract”.
e. Subject litigation did not arise out of the faithful performance of the contract as provided in Article IV, paragraph 1, subparagraph (t) of the contract which provides as follows:
“In the event the Contracting Officer shall determine that the best interests of the Government require that the Contractor initiate or defend litigation in connection with claims of third parties arising out of the performance of this contract, the Contractor will proceed with such litigation in good faith and the cost and expense of such litigation, including judgments and court costs, allowances rendered or awarded in connection with suits for wages, overtime or salaries, and reasonable attorney’s fees for private counsel when the Government does not furnish Government counsel, shall be reimbursable under this contract.” [Underscoring supplied.]
d. The final determination by the Court conclusively establishes that the Contractor wilfully and wantonly *507 violated Appendix D, paragraphs la and la2 which provide as follows:
“la. The Contractor will abide by all the terms and conditions of the Union Agreement with the following groups of employees.”
“Ia2. The Marine Warehousemen’s Local affiliated with the International Longshoremen’s Association covering warehouse employees.”
15. In view of the foregoing, the Contractor’s request for reimbursement has been denied except to the extent indicated hereinabove.
24. On November 25,1955, pursuant to the Disputes clause of the contract, Dade appealed the determination made by the Contracting Officer on Dade’s claim for $75,660.39 (of which $522.65 was allowed for Mr. Keale’s services in addition to prior amounts) to the Chief of Engineers, and demand was made that Dade be awarded a balance of $75,137.74 plus interest. Thereafter, a 3-day hearing was held on the matter by the Engineers Claims and Appeals Board, which was the duly authorized representative of the Chief of Engineers to hear and determine appeals from decisions of the Contracting Officers. At the hearing both Dade and defendant were represented by counsel.
Mr. E. Treverton Clark, Dade’s executive vice president, testified extensively at the hearing. Mr. Clark, from January until May 1952, was the top representative of Dade at the Claremont Terminal, but was not in charge of actual operations at the Terminal at the material times.; he had not been a defendant in the New Jersey litigation. Mr. Clark denied that he had at any time entered into a conspiracy with any delegate or officer of the union against the persons who were plaintiffs in the lawsuits against Dade. Mr. Clark stated that the head of the International Longshoremen’s Association controlled Dade’s hiring boss, Mr. DeAcutis; that Dade could not have fired or replaced Mr. DeAcutis as hiring boss without running the risk of a strike; and that he (Clark) did not know whether or not Mr. DeAcutis hired workers in conformity with the requirements of the agreement between Dade and the union. Mr. Clark further testified in effect that defendant’s agents were apprised of and acquiesced in all of the major policy decisions of Dade, in- *508 eluding Dade’s maj or employer-employee decisions. Defendant offered no oral testimony at the hearing.
There were introduced into the record at the Board hearing numerous exhibits, including testimony before a sub-commitee of the Committee on Interstate and Foreign Commerce of the United States Senate respecting waterfront racketeering and port security on the New York-New Jersey waterfront, correspondence between the parties, the Contracting Officer’s decision, and the proceedings in the suits against Dade, including the opinion of the Appellate Division of the Superior Court of New Jersey affirming the judgments.
25. Under date of April 4, 1957, the Corps of Engineers Claims and Appeals Board rendered its decision sustaining the decision of the Contracting Officer. The opinion of the Board reads in part as follows:
In the instant case the expenses for which reimbursement is sought arise directly from the New Jersey litigation, and accordingly must be evaluated within such frame of reference. Fundamentally, the New Jersey litigation constituted a suit to recover compensatory and punitive damages resulting from a tortious and malicious interference with the right to work. These are not the words of this Board; they are the words of the Appellate Division of the Superior Court of New Jersey. The Appellate Court noted the plaintiff’s claim that their seniority rights were being ignored at the morning shape-ups by the hiring boss with the consent and cooperation of Dade, and concluded that there was ample proof before the trial court to warrant a finding by the jury that the employer and the Union acted in concert in willfully and maliciously interfering with plaintiff’s right to employment under the collective bargaining agreement.
Thus it is established by the New Jersey Courts that Dade, as well as its Vice President Cissel and its Labor Relations Manager McGill, was guilty of the tortious conduct of entering into a conspiracy with the defendant Union _ to deprive certain Union members of their seniority rights under the Union Agreement. But ap-gellant has asserted that the decision of the New Jersey ourts is not res judicata as to the issues before this Board, and has introduced testimony in contradiction of the findings of such courts. We must agree of course *509 that the New Jersey decision is not in any formal sense res judicata as to the dispute before this Board. The parties are distinct and the issue is different. This, however, is not conclusive of the problem. Although as already indicated the appellant has offered to this Board some testimony contrary to the findings of the New Jersey Courts, there has been generally no tendency to retry here the issues there considered. This is due as much to a tacit recognition of the impossibility of duplicating before an administrative board of this nature an extensive trial before a judge with jury as it is to appellant’s insistence that notwithstanding the outcome of the New Jersey litigation, the appellant is entitled to reimbursement under its contract.
Hí ❖ ❖ H<
* * * We are persuaded not only by the authority of the Robertson Aircraft Corporation decision, BCA No. 1241 but equally by the compulsion of logic that a contractor who commits a malicious and willful tort in derogation of the contract provisions cannot be said to be in the commission of such tort acting within the framework of the contract within the meaning of Article IV (1) (t) aforequoted. In other words, the conspiracy cannot be considered as arising out of the performance of the contract; it was an act beyond the intendment and beyond the scope of the contract. Not only was the conspiracy in direct derogation of the injunction placed upon the appellant by Appendix “D” to abide by all of the terms and conditions of the Union Agreement, but it was equally violative of the labor policy of the Government as expressed in the National Labor Relations Act. It would be unreasonable to hold that the contract requires the Government to reimburse a contractor for the litigation costs arising out of willful and malicious action not only violative of the rights of third parties but in contradiction to the very terms of the contract itself. * * *
H¿ Hi H* H* H*
* * * But in the case presently before this Board we are not dealing with negligent conduct but with conduct found by the Courts to be willful and malicious, nor are we dealing with the acts of minor employees, but with the torts of a Vice President and a Labor Relations Manager, both representatives of top management. * * *
Finally, this Board rejects the argument that the Government by knowledge of labor conditions at the *510 waterfront or by tacitly consenting to the hiring of private counsel waived its right to deny reimbursement to the appellant. In the first place, there has been no evidence or even any allegation indicating that the contracting officer was aware of or had reason to be aware of the existence of the conspiracy found by the New Jersey Courts. The most that can be said is that the contracting officer knew generally of the labor conditions at the waterfront, but that is a far cry from knowledge of conspiracy. As for the action of the Government in consenting to the hiring of private counsel, such action seems to us to be completely consistent with normal procedure, particularly when the appellant deified the acts for which the court ultimately imposed liability. And even here the correspondence clearly indicates that the Government did not promise reimbursement, but specifically stated that reimbursability of litigation costs and attorney fees would be determined upon the outcome of the litigation. As this decision has indicated, such a position was discreet.
For all of these reasons, this Board concludes that appellant is not entitled to be reimbursed for the costs of defending the New Jersey litigation or for the judgment costs in connection therewith and this appeal must be and it is hereby DENIED.
26. On April 30,1957, Dade, pursuant to Article X of the contract, appealed the decision of the Corps of Engineers Claims and Appeals Board to the Secretary of the Army. Through his designated representative, the Army Contract Appeals Panel of the Armed Services Board of Contract Appeals, the Secretary of the Army, after a further hearing and consideration of the briefs submitted, denied Dade’s appeal for reimbursement of the aforesaid expenses in the amount of $75,137.74 plus interest. The opinion of the Board reads in part as follows:
Our problem may be simply stated: Has the appellant satisfied the Board, with evidence of record, that the decision of the contracting officer was erroneous? In an appeal attacking the validity of findings of fact or a decision by a contracting officer, not patently erroneous, it is incumbent upon the appellant to come forward with evidence showing error therein. In the absence of such evidence this Board camiot properly overrule the decision of the contracting officer. Appeal *511 of A. E. Ratner Chemical Co., ASBCA No. 474, 5 CCF 61113.
In support of its burden, the appellant has laid before us everything that was received by the Board below, the transcript of that hearing, briefs and arguments, and briefs with appendices presented on appeal to the Appellate Division and Supreme Court of New Jersey that were added to the file by agreement. We discount the briefs and arguments, for recital of a fact or an alleged fact therein is not evidence before the Board. Appeal of Kobrin Box Manufacturing Co., ASBCA No. 455.
At the time the decision was made under the “Disputes” article, the contracting officer had before him a set of facts, one of which was the judgment handed down against Dade Brothers, affirmed on appeal by the highest court, The Supreme Court of New Jersey. That was a fact that he could not ignore, and it translated into the meaning that punitive damages and compensatory damages had been imposed upon the appellant for a breach of contract and a conspiracy to deprive the plaintiffs of their contractual right to work. The contract involved in that suit was the union-management contract from which we quoted above and which the appellant was required by its contract with the Government to observe fully and faithfully. In view of the confirmed judgment of the New Jersey court, the contracting officer was completely justified in reaching his first, second and fourth reasons for denying the appeal. That set of reasons is the equivalent of a finding that the appellant wilfully breached its contract with the union and in the same act breached its contract with the Government. The remaining reason, i.e., that the litigation did not arise out of faithful performance of the contract, seems to flow necessarily from the others, for it would require the rarest of circumstances, as to which we are unwilling to conjecture, to transform a breach of contract into faithful performance of the contract.
The appellant has not shown us that the judgment does not exist nor that it is erroneous, nor that the appellant did not breach both the union contract and the Government contract, nor that when the acts that resulted in the litigation were committed the appellant was engaged in the faithful performance of its Government contract.
The appeal is denied.
*512 27. This case is before the court on a stipulation of facts agreed upon by the parties, together with numerous exhibits, including all documents and proceedings referred to in this report. No oral testimony was offered in this court. The parties have agreed to reserve the determination of the amount of recovery, if any, for further proceedings under Eule 38 (c).
28. The entire record of the case does not establish that the decision of the Armed Services Board of Contract Appeals was arbitrary, capricious, or unsupported by substantial evidence.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover, and the petition is therefore dismissed.

 Plaintiff Dade Brothers, Inc. is the government contractor and the employer which was sued. Plaintiff Chesapeake Industries, Inc. is the parent of Dade Brothers; it took an assignment of all of the latter’s right, as asserted in the present action, against the defendant.

 The three cases were consolidated and tried together.